UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA RUCINSKI,

     Plaintiff,                                 Case No. 13-cv-14667
                                                  Hon. Matthew F. Leitman

v.

COUNTY OF OAKLAND *et al.*,

     Defendants.
_____/

### OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF #25) AND TERMINATING AS MOOT DEFENDANTS' MOTION FOR LEAVE TO FILE EXPERT DISCLOSURES OR STRIKE PLAINTIFF'S EXPERT DISCLOSURES (ECF #31)

     This case arises out of the tragic death of Jeremy Rucinski ("Rucinski"), a troubled young man who suffered from schizophrenia and other mental health conditions.

     In January 2013, Rebecca Vandenbrook ("Vandenbrook") called 911 because Rucinski, her boyfriend, was experiencing a schizophrenic episode. Oakland County Sheriff deputies were dispatched to the house where Rucinski and Vandenbrook lived. The deputies ultimately encountered Rucinski in the garage, armed with a switchblade. Rucinski either told the deputies to "bring it on" or said "here we go," and he then approached Deputy Sheriff Sarah McCann ("McCann") while brandishing the switchblade. Fearing for her safety, McCann shot Rucinski with her handgun. Unfortunately, Rucinski died from his wounds.

     In this action, Plaintiff Debra Rucinski ("Plaintiff"), the personal representative for Rucinski's estate, asserts claims against McCann and Deputy Sheriff Sharon Beltz

("Beltz") under 42 U.S.C. § 1983 for violating Rucinski's Fourth Amendment rights and under state law for assault and battery and gross negligence. Plaintiff also asserts a municipal liability claim against Oakland County under 42 U.S.C. § 1983.

Defendants have now moved for summary judgment. (*See* the "Motion for Summary Judgment," ECF #25.) Because Plaintiff's claims are foreclosed by controlling Sixth Circuit and Michigan Supreme Court precedent, the Court **GRANTS** the motion.

## FACTUAL BACKGROUND

Rucinski suffered from schizophrenia, paranoia, and bipolar disorder, among other mental health conditions. (*See* Vandenbrook Dep., ECF #25-2 at 11, Pg. ID 121.) In early January 2013, Rucinski began experiencing an episode of mental health decompensation. (*See id.* at 11-12, Pg. ID 121-22.)

On the afternoon of January 6, 2013, Vandenbrook arrived home and found Rucinski suffering from "full-blown paranoia." (*Id.* at 12, Pg. ID 122.) Rucinski asked Vandenbrook to give him his cigarettes. (*See id.* at 21, Pg. ID 125.) Rucinski yelled at Vandenbrook, pulled a switchblade from his pants pocket, and opened the blade. (*See id.*) Vandenbrook gave Rucinski his cigarettes, and Rucinski then took the knife into the garage and closed the door. (*See id.* at 23, Pg. ID 127.)

Vandenbrook closed herself in the bathroom and called 911. (*See id.*) Vandenbrook told the 911 operator that Rucinski "is schizophrenic and is having a breakdown." (The "911 Transcript," ECF #25-4 at 3, Pg. ID 135.) Vandenbrook stated that she was worried that Rucinski might hurt himself and that "[h]e needs to get taken to

a hospital." (*Id.* at 8-9, Pg. ID 139-40.)   Vandenbrook informed the operator that Rucinski had a knife and was alone in the garage.  (*See id.* at 4, 10; Pg. ID 136, 141.)

Shortly thereafter, the Oakland County Sheriff's Office dispatched units to Rucinski's residence to conduct a "welfare check." (McCann Dep., ECF #28-5 at 25, Pg. ID 422.)  The dispatcher advised the units that there was a schizophrenic individual at the residence who had been "acting abnormally" and "needed to go to the hospital." (*Id.* at 26-27; Pg. ID 422.)  The dispatcher stated that the individual might be in the garage and might have a knife.  (*See id.* at 30-31, Pg. ID 423.)

Deputy Sheriffs McCann, Sharon Beltz ("Beltz"), Eric Rymarz ("Rymarz"), and Drakkar Eastman ("Eastman") (collectively, "the deputies") responded to the dispatch. The deputies arrived at Rucinski's residence at approximately the same time.  (*See id*. at 35, Pg. ID 424.)  Upon their arrival, McCann and Beltz walked toward the garage door. (*See id.*)  McCann heard noises coming from inside the garage, and she assumed that the individual they were looking for was inside.  (*See id.* at 39, Pg. ID 425.)

Meanwhile, Rymarz and Eastman went to the front door of the house.  (*See id.* at 36, Pg. ID 424.)  Vanderbrook opened the front door and allowed Rymarz and Eastman to enter.  (*See* Rymarz Dep., ECF #28-7 at 25, Pg. ID 480.)  Vandenbrook reiterated what the dispatcher had told the deputies: that Rucinski was suffering from mental illness and that she was concerned about him.  (*See id*.)  Vanderbrook led Rymarz and Eastman to the garage, where she believed Rucinski to be.  (*See id.* at 32, Pg. ID 487.)  Without knocking or identifying himself, Rymarz opened the interior door that led to the garage. (*See id.* at 34, Pg. ID 489.)  Rymarz then pressed the button to open the overhead garage

3

door leading to the exterior of the house.  (*See id.* at 35, Pg. ID 490.)  Rymarz and Eastman then began to walk down a flight of stairs into the garage.  (*See id.* at 36, Pg. ID 491.)  Neither Rymarz nor Eastman was holding a weapon.  (*See id.*)

As the overhead garage door was opening, the deputies saw Rucinski in the corner of the garage.  (*See* McCann Dep. at 54, Pg. ID 429.)  Beltz entered the garage through the now-opened overhead garage door.  (*See* Beltz Dep., ECF #25-8 at 20, Pg. ID 454.)  Beltz intended to make contact with, and speak to, Rucinski.  (*See id.* at 22, Pg. ID 456.)  Beltz looked at McCann, and she understood that McCann would stay back and provide "cover."  (*See id.* at 23, Pg. ID 457.)  Beltz unholstered her taser and hid it behind her leg as she entered the garage between two parked cars.  (*See id.* at 21, 28; Pg. ID 455, 462.)  McCann, who had unholstered her firearm instead of her taser, remained farther away from Rucinski than the other deputies.  (*See* McCann Dep. at 54, 60, Pg. ID 429-30; Beltz Dep. at 20, Pg. ID 454.)  At this point, the deputies were blocking all of the paths that Rucinski could have used to exit the garage.  (*See* McCann Dep. at 55, Pg. ID 429.)

Before Beltz could say anything to Rucinski, Rymarz called out Rucinski's name two times.  (*See* Rymarz Dep., ECF #28-7 at 37, Pg. ID 492.)  Rucinski looked at Rymarz, reached into his pocket, and pulled out the switchblade.  (*See id.*)  Rymarz then unholstered his taser and alerted the other deputies that Rucinski had a knife.  (*See id.* at 40-41, Pg. ID 495-96; Eastman Dep., ECF #28-8 at 53, Pg. ID 523.)

Rymarz instructed Rucinski to drop the knife.  (*See* Rymarz Dep., ECF #28-7 at 42, Pg. ID 497.)  Rucinski did not comply with Rymarz's order.  (*See* Rymarz Dep., ECF #25-9 at 66, Pg. ID 223.)  Instead, while wielding the knife in his hand, Rucinski said

4

"bring it on" or "here we go." (*See* Beltz Dep. at 28, Pg. ID 462.) Rucinski then turned away from Rymarz and began walking toward McCann, who was standing near the overhead garage door. (*See* McCann Dep. at 50, 68; Pg. ID 428, 432.) Rucinski advanced toward McCann while holding the knife outstretched in his right hand. (*See* Taser Video, ECF #25-15.) At that point, McCann could not back up any more due to icy and snowy conditions on the driveway. (*See* McCann Dep. at 63, Pg. ID 431.) Several of the deputies continued to instruct Rucinski to put down the knife, but he refused to comply. (*See* Rymarz Dep., ECF #28-7 at 42, Pg. ID 497; Eastman Dep. at 53, Pg. ID 523; McCann Dep. at 83-84, Pg. ID 436. *See also* Taser Video.) While still holding the knife, Rucinski approached to within five feet of McCann. (*See* McCann Dep. at 67, Pg. ID 432.)

Beltz, who remained between the two cars parked inside the garage, felt that McCann was "in danger." (Beltz Dep. at 32, 35; Pg. ID 466, 469.) Accordingly, Beltz fired her taser at Rucinski. (*See id.* at 32, Pg. ID 466.) At approximately the same time, McCann shot her firearm at Rucinski, fatally hitting him once in the chest. (*See* McCann Dep. at 74-75, Pg. ID 434; Beltz Dep. at 34, Pg. ID 468.) At the time that McCann made the decision to fire her weapon, she did not know whether Beltz had discharged her taser. (*See id.* at 90, Pg. ID 438.)

### NATURE OF PLAINTIFF'S CLAIMS AND PROCEDURAL HISTORY

In this action, Plaintiff asserts a claim under 42 U.S.C. § 1983 against McCann and Beltz for using excessive force in violation of Rucinski's Fourth Amendment rights. (*See* the "Complaint," ECF #1 at ¶¶26-30.) Plaintiff also asserts state-law claims against

McCann and Beltz for assault and battery and gross negligence.  (*See id.* at ¶¶31-34.)
Finally, Plaintiff asserts a § 1983 claim against Oakland County for failing to adequately
train, hire, and/or supervise its employees.  (*See id.* at ¶¶35-38.)

Defendants moved for summary judgment on all of Plaintiff's claims.  The Court
heard oral argument on the motion on March 10, 2015.  Thereafter, the Court issued an
order staying this action pending the Supreme Court's decision in *Sheehan v. City and
County of San Francisco*, 743 F.3d 1211 (9th Cir. 2014), *cert. granted*, 83 U.S.L.W. 3326
(U.S. Nov. 25, 2014) (No. 13-1412), and allowing the parties to file supplemental briefs
addressing *Sheehan* following the Supreme Court's decision.  (*See* ECF #39.)  On May
18, 2015, the Supreme Court issued its decision in *Sheehan*, 135 S. Ct. 1765 (2015), and
the parties have now filed their supplemental briefs.[1]  (*See* ECF ##40-41.)   For the
reasons stated below, the Court **GRANTS** Defendants' Motion for Summary Judgment.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine
dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d
321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–
52 (1986)) (quotations omitted). When reviewing the record, "the court must view the
evidence in the light most favorable to the non-moving party and draw all reasonable
inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of

---

[1]  Although the Court initially believed that the Supreme Court might address certain
legal issues relevant to this action in *Sheehan*, the Supreme Court decided *Sheehan* on
grounds that are not directly relevant here.

the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.  Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury."  *Id.* at 251-252.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

### A. Excessive Force

#### 1.  The Qualified Immunity Framework

McCann and Beltz argue that they are entitled to qualified immunity on Plaintiff's § 1983 excessive force claim.  "Under the doctrine of qualified immunity, government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Dominguez v. Correctional Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (internal citation omitted).  The plaintiff bears the burden of showing that government officials are not entitled to qualified immunity.  *See Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005).

"In assessing qualified immunity, the court, viewing the facts in the light most favorable to the plaintiff, determines whether: 1) the violation of a constitutional right has occurred; and 2) the constitutional right at issue was clearly established at the time of defendant's alleged misconduct."  *Grawey v. Drury*, 567 F.3d 302, 309 (6th Cir. 2009).  "The Court may address these prongs in any order, and if the plaintiff cannot make both

7

showings, the [defendant] officer is entitled to qualified immunity." *Brown v. Lewis*, 779 F.3d 401, 412 (6th Cir. 2015). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).

### 2.   McCann and Beltz Are Entitled to Qualified Immunity Because Plaintiff Has Failed to Create a Material Factual Dispute as to Whether They Used Excessive Force

The Court first addresses prong one of the qualified immunity analysis: whether McCann and Beltz violated Rucinski's constitutional rights by shooting him with a firearm and taser, respectively. Plaintiff asserts that the constitutional right at issue here is Rucinski's right to be free from excessive force during his encounter with the deputies. (*See, e.g.*, Plaintiff's Brief, ECF #28 at 15, Pg. ID 374.) "A claim that the government used excessive force during the course of a seizure is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Chappell v. City of Cleveland*, 585 F.3d 901, 908 (6th Cir. 2009) (citing *Graham v. Connor*, 490 U.S. 386, 388 (1989). Determining whether a law enforcement officer's use of force is objectively reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396.

In applying the objective reasonableness standard, the United States Court of Appeals for the Sixth Circuit has adopted a "segmented analysis." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). Under this approach, a court must consider "the totality of the circumstances facing [a police officer] at the time [she] made

8

[her] split-second judgment[] immediately prior to using deadly force." *Chappell*, 585 F.3d at 909. "The relevant time for the purposes of this inquiry is the moment immediately preceding the shooting." *Bouggess v. Mattingly*, 482 F.3d 886, 890 (6th Cir. 2007). In other words, "it is the reasonableness of the 'seizure' that is the issue, *not the reasonableness of the [officers'] conduct in time segments leading up to the seizure*." *Chappell*, 585 at 909 (emphasis added).

Moreover, an officer's use of deadly force is objectively reasonable "'where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others.' Thus, if the record shows the officers had probable cause to believe [the suspect] posed a serious threat, their use of deadly force was constitutionally permissible." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 403 (6th Cir. 2015) (quoting *Garner*, 471 U.S. at 11). "When a person aims a weapon in a police officer's direction, that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death." *Greathouse v. Couch*, 433 Fed. App'x 370, 373 (6th Cir. 2011).

Here, Rucinski pulled a switchblade out of his pocket, opened the blade, said "bring it on" or "here we go," and began walking directly toward McCann. Rucinski disregarded the deputies' orders to drop the knife, and he approached to within five feet of McCann with the knife in his outstretched hand.[2] At that point, McCann was unable to

---

[2] Plaintiff attempts to create a factual dispute as to whether Rucinski said "bring it on" or "here we go." According to Plaintiff, "Deputy Rymarz testified that [Rucinski] did not say anything during the entire encounter." (Pla.'s Br., ECF #28 at 4, Pg. ID 363.) In

retreat due to snow and ice on the driveway.  (*See* McCann Dep. at 63, Pg. ID 431.)  At that point, McCann and Beltz pulled their triggers.  These undisputed facts establish that in the moment immediately before firing at Rucinski, McCann and Beltz had probable cause to believe that Rucinski posed an imminent threat of serious physical harm to McCann.  Their use of force was thus objectively reasonable as a matter of law.

Indeed, the Sixth Circuit has held that officers act reasonably when they use deadly force under these circumstances.  For instance, in *Chappell, supra*, the Sixth Circuit affirmed summary judgment in favor of police officers who shot and killed a teenage boy named Brandon McCloud while searching his home for a robbery suspect. The police found McCloud hiding in his bedroom closet.  McCloud exited the closet holding a knife, and he ignored the officers' orders to drop the weapon.  McCloud moved toward the officers, approaching to within five-to-seven feet of them.  Believing that McCloud posed an immediate and serious threat to their safety, the officers shot and

_____

support of this statement, Plaintiff cites "Exhibit E, pp 27-28." (*Id.*)  But Exhibit E to Plaintiff's brief is the deposition transcript of Deputy Beltz, not Deputy Rymarz.  (*See* ECF #28-6.)  And pages 27-28 of Deputy Rymarz's deposition transcript do not address whether Rucinski remained silent during the encounter. (*See* ECF #28-7 at 27-28, Pg. ID 482-83.)  At one point in his testimony, Deputy Rymarz says that Rucinski did not respond when Rymarz called his name (*see id.* at 37, Pg. ID 492), but that testimony cannot be taken to mean that Rucinski stayed silent throughout the entire encounter. Rymarz was never asked during his deposition whether Rucinski stayed silent the entire time, and Rymarz did not testify that Rucinski did.  In any event, even if there was a factual dispute as to whether Rucinski said "bring it on" or "here we go," Defendants would still be entitled to summary judgment.  Even if Rucinski did not make the statement, he moved toward McCann while brandishing a knife and disobeyed commands to stop, and under those circumstances it was reasonable for McCann to use deadly force.

killed McCloud.  The Sixth Circuit held that the officers were objectively reasonable in
using deadly force against McCloud:

> [I]t is apparent that if the detectives had hesitated one instant,
> i.e., long enough to allow McCloud to take even one more
> step, they would have been within his arm's reach and
> vulnerable to serious or even fatal injury.  These undisputed
> circumstances *clearly support* probable cause to believe that
> serious harm was imminently threatened and *that use of
> deadly force in self-defense was justified*.

*Chappell*, 585 F.3d at 911 (emphasis added).

The Sixth Circuit reached the same conclusion in *Rhodes v. McDannel*, 945 F.2d
117 (6th Cir. 1991).  In that case, officers responded to a call from a woman who reported
that a man was threatening her with a knife.  When the officers arrived at the woman's
home, the man brandished the knife and approached to within four-to-six feet of the
officers.  One of the officers then shot the man.  The Sixth Circuit held that because the
man "advanced upon the officers … with a raised [knife], despite several warnings to
halt, [the officer] was justified in using deadly force."  *Id.* at 120.

Similarly, in *Gaddis v. Redford Twp.*, 364 F.3d 763 (6th Cir. 2004), three police
officers initiated a traffic stop of a motorist suspected of driving while intoxicated.  When
the suspect swung a knife at one of the officers, the other two officers fired their
handguns at the suspect.  The Sixth Circuit held that, under the circumstances, "[i]t was
reasonable for the[ officers] to respond with lethal force."  *Id.*

This unbroken line of Sixth Circuit cases compels the conclusion that a police
officer may reasonably use deadly force when directly threatened with a knife in a
manner that poses an immediate and serious risk to her personal safety.  McCann faced

11

just such a threat from Rucinski.  Her use of deadly force was thus objectively reasonable as a matter of law.

Beltz's use of non-lethal force – firing her taser – was likewise objectively reasonable as a matter of law.  Indeed, Beltz could have used *lethal* force to protect McCann.  *See Pollard*, 780 F.3d at 403 (officer may use deadly force where "suspect poses a threat of serious physical harm, either to the officer *or others*") (emphasis added).  Thus, her use of non-lethal force to protect McCann was reasonable. *See, e.g.*, *Wargo v. Municipality of Monroeville, PA*, 646 F.Supp.2d 777, 785 (W.D. Pa. 2009) ("No reasonable jury could conclude that the use of non-lethal force was excessive in this situation in which deadly force would have been justified.")

Plaintiff counters that McCann and Beltz cannot escape liability because they recklessly created the circumstances that led to their need to use force against Rucinski. (Pla.'s Br. at 13, Pg. ID 372.)  Plaintiff criticizes the deputies' handling of the situation from the moment they arrived at the house.  For instance, Plaintiff contends that the deputies recklessly failed to communicate among themselves and formulate a group plan for making contact with Rucinski.  In addition, Plaintiff insists that the deputies could have used a "cover and conceal" method – i.e., they could have ordered Rucinski to come out of the garage with his hands raised.  (*See* Compl. at ¶29.)  Instead, Plaintiffs argue, McCann and Beltz recklessly entered the garage and approached Rucinski with their weapons readied, even though they had been warned that Rucinski was suffering from a schizophrenic episode.  Plaintiff insists that, in light of their recklessness, McCann and

Beltz cannot avoid liability on the ground that they needed to protect against the threat of immediate harm.

But the Sixth Circuit has expressly "rejected" this argument. *See Livermore*, 476 F.3d at 406 (citing *Gaddis*, 364 F.3d at 772 and *Dickerson v. McClellan*, 101 F.3d 1151, 1161 (6th Cir. 1996)).  The Sixth Circuit has squarely held that an officer who uses deadly force to protect against an immediate threat of serious physical harm may *not* be held liable on the ground that she "acted recklessly in creating the circumstances which required the use of deadly force." *Livermore*, 476 F.3d at 406.  Under the Sixth Circuit's segmented approach to excessive force, the question is "*not* whether it was reasonable for the police to create the circumstances." *Dickerson*, 101 F.3d at 1161 (emphasis added). Rather, the sole issue is whether the officer's actions were objectively reasonable "at the time [she] made [her] split-second judgment[] immediately prior to using deadly force." *Chappell*, 585 F.3d at 909.  The Court's analysis focuses on the reasonableness of the officer's actions in that narrow time frame, "[i]rrespective of any errors [by the officer] that contributed to the circumstances." *Id.* at 915.  Accordingly, Plaintiff cannot prevail on her excessive force claim on the ground that the deputies acted unreasonably in creating the circumstances that led to their need to fire at Rucinski.[3]

---

[3]  In support of her argument that the deputies recklessly created the need to use deadly force, Plaintiff submitted an expert report and affidavit from W. Ken Katsaris, a purported expert in police procedures. (*See* ECF ##28-12 and 28-13, Pg. ID 551-563.) Mr. Katsaris criticizes many aspects of the deputies' conduct leading up the shooting of Rucinski and concludes that their conduct "fell below recognized, accepted and trained police enforcement practices…." (ECF #28-12 at Pg ID 555.)   But Mr. Katsaris's criticisms of the deputies' pre-shooting conduct does not create a material factual dispute

Plaintiff also argues that McCann's use of deadly force cannot be deemed reasonable as a matter of law because the other deputies on the scene utilized non-lethal force rather than deadly force. Plaintiff notes that Beltz and Rymarz unholstered their tasers rather than their firearms, and Plaintiff contends that their choice of nonlethal force is evidence that McCann's use of deadly force was excessive. But the question of whether an officer's use of deadly force was reasonable does not turn on whether an officer could potentially have used non-lethal force. Instead, the relevant question is whether the officer "ha[d] probable cause to believe" that the suspect "pose[d] a threat of serious physical harm, either to the officer or others." *Pollard*, 780 F.3d at 403. And where, as here, an officer's use of "deadly force is … justified under the Constitution, there is no constitutional duty to use non-deadly alternatives first." *Plakas v. Drinski*, 19 F.3d 1143, 1148 (7th Cir. 1994). Plaintiff has cited no directly contrary authority.[4]

---

because, as explained above, the Court must focus on the moment immediately preceding the shooting, not upon allegedly-reckless conduct leading up to that moment. Mr. Katsaris also opines that the use of deadly force against Rucinski was "excessive, unnecessary, and objectively unreasonable." (*Id.*) However, the Sixth Circuit has held that this exact type of opinion by a police practices expert in an excessive force case is insufficient to create a material factual dispute because it constitutes a "legal conclusion." *See Demerrel v. City of Cheboygan*, 206 Fed. App'x 418, 426-27 (6th Cir. 2006).

[4]  Plaintiff cites *Carter v. Chattanooga*, 850 F.2d 1119, 1122 (6th Cir. 1988) and *Jefferson v. Lewis*, 594 F.3d 454, 462 (6th Cir. 2010) for the proposition that McCann was obligated to use non-lethal force here. (*See* Plaintiff's Supplemental Brief, ECF #41 at 5, Pg. ID 783.) Neither case controls here. The rule cited in *Carter* – i.e., that deadly force is "permissible only if used as a last resort to prevent escape of a suspect" – is not applicable where, as here, the officer fired her weapon to protect against an immediate threat to her safety. Moreover, in *Jefferson*, the Sixth Circuit affirmed the denial of summary judgment to an officer who "shot an unarmed woman who had not threatened him from close range." *Jefferson*, 594 F.3d at 458. Unlike the officer in *Jefferson*,

14

Accordingly, Plaintiff may not avoid summary judgment on the ground that McCann could potentially have used nonlethal force.

In sum, the undisputed evidence establishes that McCann and Beltz acted in an objectively reasonable manner when they fired their weapons at Rucinski and that they thus did not violate Rucinski's Fourth Amendment right to be free from excessive force. Accordingly, McCann and Beltz are entitled to qualified immunity on Plaintiff's excessive force claim.[5]

## B. Assault and Battery

Plaintiff brings state-law claims for assault and battery against McCann and Beltz. (*See* Compl. at ¶¶31-34.)   A battery is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person."  *People v. Nickens*, 685 N.W.2d 657, 661 (2004).  An assault is "an attempt to commit a battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery."  *Id.*

McCann and Beltz contend that they are entitled to immunity on Plaintiff's assault and battery claims.  (*See* Mot. at 19, Pg. ID 110.)  The Court agrees.

---

McCann was justified in using lethal force because she had been threatened by an armed individual who posed an immediate and serious threat to her safety.

[5]   Because Plaintiff has failed to create a material factual dispute as to whether McCann and Beltz violated Rucinski's constitutional rights, there is no need to conduct a separate analysis of whether the right that Plaintiff invokes here was clearly established.  *See Livermore*, 476 F.3d at 406.

Under Michigan law, a law enforcement officer is entitled to immunity from an intentional tort claim if she can establish that "she acted or reasonably believed she was acting within the scope of her authority, she acted in good faith, and she was performing discretionary acts, as opposed to ministerial acts." *Grawey*, 567 F.3d at 315 (citing *Ross v. Consumer Power*, 363 N.W.2d 641 (1984) and *Odom v. Wayne County*, 760 N.W.2d 217, 222 (2008)); *see also* M.C.L. § 691.1407(3). In order to show that she acted in good faith, the law enforcement officer "must establish that [s]he acted without malice." *Odom*, 760 N.W.2d at 225. "[T]he standard is a subjective one from the perspective of the [officer] with respect to whether [s]he was acting in good faith." *Latits v. Phillips*, 826 N.W.2d 190, 195 (Mich. Ct. App. 2012).

McCann and Beltz have presented undisputed evidence that they acted in good faith and without malice to defuse the situation and assess Rucinski's mental health needs. McCann testified that the deputies' goal when they arrived at the house was "to have … communication with [Rucinski]" and to "potentially get him hospitalized." (McCann Dep. at 33, Pg. ID 424.) McCann further testified that she "didn't want to … scare [Rucinski]" and that she "want[ed] to make sure that [she] had some communication with [Rucinski] so that [she could] ke[ep] the situation calm." (*Id.* at 43-44, 426.) McCann and Beltz have also presented undisputed evidence that their eventual use of force was intended to protect McCann from the imminent and serious threat posed by Rucinski. (*See, e.g.*, Beltz Dep. at 35, Pg. ID 469 (noting that Beltz saw that McCann was "in danger").) In contrast, Plaintiff has cited no evidence from which a reasonable factfinder could infer that McCann and Beltz acted maliciously or in bad faith. At most,

16

Plaintiff's evidence establishes that McCann, Beltz, and the other responding deputies made certain errors. Under these circumstances, McCann and Beltz are entitled to immunity on Plaintiff's assault and battery claims.

The Michigan Court of Appeals reached the same conclusion in *Latits, supra*. In that case, Laszlo Latits ("Latits") fled from a traffic stop and led four patrol cars on a high-speed chase. The police eventually cornered Latits, who rammed one of the patrol cars with his vehicle. One of the officers, believing Latits to pose an immediate threat to the safety of the officers, shot and killed Latits. Latits' estate brought an assault and battery claim against the officer. Like Plaintiff here, Latits' estate argued that the defendant could be held liable because he "exercised poor judgment or was mistaken about his justification in using deadly force." *Latits*, 826 N.W.2d at 194. The Michigan Court of Appeals rejected that argument and held that the officer was immune because the evidence established that he had acted in good faith:

> As long as defendant can show that he had a good-faith belief that he was acting properly in using deadly force, he is entitled to the protections of governmental immunity regardless of whether he was correct in that belief. And there is no evidence in this case to show that defendant did not have such a belief.
>
> Defendant's stated reason for firing his weapon was to ensure his safety and the safety of others. The facts support the conclusion that defendant would have such a reason, and plaintiff presented no evidence to establish any other motivation.
>
> ***
>
> *Plaintiff, on the other hand, identifies no evidence supporting a finding of malice*. Plaintiff spends a good portion of her

17

> argument on this point discussing whether the use of deadly force was justified. But the standard in evaluating the governmental immunity question is not whether, when viewing the facts objectively with the benefit of hindsight, the use of deadly force was justified. Rather, as discussed in *Odom*, 482 Mich. at 481, 760 N.W.2d 217, the standard is a subjective one from the perspective of defendant with respect to whether he was acting in good faith. Whether the legal standards for acting in self-defense or defense of others was met is not controlling. Whether the information relayed to defendant by other officers was accurate is not relevant. What is relevant was whether defendant, in good faith, believed that he needed to fire his weapon to protect himself and others.

*Latits,* 826 N.W.2d at 195 (emphasis added); *see also Rush v. City of Lansing*, No. 13-1317, 2015 WL 632321, at *9 (W.D. Mich. Feb. 13, 2015) (holding that officer who shot knife-wielding suspect was entitled to immunity on state-law intentional tort claim because officer's "unrebutted testimony indicates that he was in fear for his life while [plaintiff] wielded her knife before he shot her" and "[p]laintiff has not set forth facts or allegations that cast doubt on [the officer's] testimony").[6]

As in *Latits* and *Rush*, the undisputed evidence here establishes that McCann and Beltz acted in subjective good faith. They are thus entitled to immunity on Plaintiff's assault and battery claim.

Plaintiff resists this conclusion. She cites the Michigan Supreme Court's decision in *Odom, supra*, for the proposition that a defendant is not entitled to immunity on an intentional tort claim when he acts in "reckless disregard of the rights of another," and

---

[6] The plaintiff in *Rush* pleaded the claim as one for gross negligence, but the court held that the claim was more properly characterized as an intentional tort. *See Rush*, 2015 WL 632321 at *3.

Plaintiff insists that there is a factual dispute as to whether McCann and Beltz acted with a reckless disregard for Rucinski's rights. (Pla.'s Br at 16, Pg. ID 375 (quoting *Odom*, 760 N.W.2d at 228).) The Court reads *Odom* differently.

While the Michigan Supreme Court did refer to recklessness in *Odom*, the court made clear that only extreme recklessness will strip a governmental actor of immunity for intentional torts. Indeed, the court described the relevant degree of recklessness as "a reckless indifference to the common dictates of humanity," and the court compared that recklessness to acting with "such indifference to whether harm will result *as to be equal to a willingness that harm will result*." *Odom*, 760 N.W.2d at 225 (emphasis added). Most importantly, after referring to recklessness, the court summed up its holding by emphasizing that the immunity inquiry focuses on the presence or absence of *malice*: "Thus, the proponent of individual immunity must establish that he acted without *malice*." *Id.* (emphasis added). And *Latits* confirms that the immunity inquiry under *Odom* focuses on malice or conduct that is the equivalent of malice, not on garden-variety recklessness.

Here, even if Defendants recklessly disregarded police practices and procedures, as Plaintiffs claim, the Defendants did not act with culpability that even approaches malice and/or a malicious or wanton disregard of Rucinski's rights. Thus, Defendants are entitled to immunity on Plaintiff's assault and battery claim. *See Odom*, 760 N.W.2d at 225-26.

**C. Gross Negligence**

Plaintiff also asserts a gross negligence claim against McCann and Beltz. (*See* Compl. at ¶¶31-34.) Plaintiff alleges that McCann and Beltz were grossly negligent when they cornered Rucinski in the garage and used force against him, even though they knew that he was experiencing a mental breakdown. (*Id.* at ¶33.) McCann and Beltz argue that they are entitled to summary judgment on two grounds: (1) Plaintiff may not recast her assault and battery claim as a gross negligence claim; and (2) in any event, McCann and Beltz are entitled to immunity. (*See* Mot. at 21, Pg. ID 112.) The Court agrees with McCann and Beltz on both points.

First, Plaintiff's gross negligence claim fails as a matter of law because it rests upon McCann's and Beltz's *intentional* decisions to fire their weapons at Rucinski, and an officer's intentional use of force does not give rise to a claim for gross negligence. Indeed, Michigan courts have "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2004), *overruling in part on other grounds recognized by Brown*, 779 F.3d at 420. Where, as here, a plaintiff's claim of gross negligence against an officer is "undoubtedly premised on the intentional tort of battery," the gross negligence claim is "not cognizable under Michigan law." *Livermore*, 476 F.3d at 408 (citing *VanVorous, supra*).

The Michigan Court of Appeals applied this rule in *Latits, supra*. In addition to asserting an assault and battery claim based on a police shooting (discussed above), the plaintiff-estate in that case asserted a gross negligence claim. That claim rested, in part,

20

on the estate's allegations that the officers "fail[ed] to follow proper police procedures;" "fail[ed] to appreciate that [the decedent] posed no threat of harm;" and "recklessly point[ed] a gun at or in the direction of [decedent]." *Latits*, 826 N.W.2d at 196. The court held that the estate could not proceed on this gross negligence theory because the "gravamen" of the claim was that the officer "intentionally and improperly shot" the decedent:

> Defendant did not recklessly shoot [decedent]. There is no claim that [decedent] was shot as the result of an accidental discharge of defendant's firearm or that defendant otherwise had not intended to shoot [decedent]. Negligence might have been the proper claim if defendant had unintentionally pulled the trigger or if defendant had been aiming at a different target but accidentally shot [decedent] instead. But there was nothing negligent or reckless about defendant's decision to point his firearm at [decedent] and shoot – he did so intentionally.

*Latits*, 826 N.W.2d at 196. *Latits* further confirms that because McCann and Beltz intentionally discharged their weapons at Rucinski, Plaintiff may not assert a gross negligence claim against them.

*Johnson v. Driggett*, No. 306560, 2013 WL 375701 (Mich. Ct. App. Jan. 31, 2013), underscores that conclusion. In that case, a police officer observed Harvey Steward ("Steward") acting erratically and running in and out of traffic. The officer confronted Steward, who assaulted the police officer and reached for the officer's gun. The officer then shot and killed Steward. Thereafter, Steward's estate alleged that the defendant police officer was grossly negligent in the manner in which he confronted

21

Steward.  The Michigan Court of Appeals held that Steward's estate could not prevail his gross negligence claim because it was premised on the officer's intentional use of force:

> Plaintiffs' [sic] allegations that defendant acted in a grossly negligent manner by failing to communicate with [Steward], failing to know and understand the state of mind of [Steward], failing to follow proper police standards and procedures, failing to follow police department policies and training, and using unnecessarily excessive force all pertain to the circumstances surrounding defendant's decision to fire his weapon – an intentional act.  Stated differently, these allegations all relate to the reasonableness or correctness of defendant's *intentional* use of deadly force … and are fully premised on plaintiff's underlying claim of excessive force…. Accordingly, plaintiffs' allegations … [are] legally insufficient to justify recovery on a theory of gross negligence as a matter of law.

*Id.* at *7 (citing *VanVorous*, 687 N.W.2d at 143) (emphasis in original).  As in *Johnson*, Plaintiff may not prevail on her gross negligence claim because, at bottom, it rests on the deputies' intentional use of force against Rucinski.

Second, and in any event, McCann and Beltz are entitled to immunity on Plaintiff's gross negligence claim.  Under Michigan law, a law enforcement officer is immune from a claim that her gross negligence caused an injury unless the alleged negligence is "*the* proximate cause of the injury or damage.'"  *Livermore*, 476 F.3d at 408 (quoting M.C.L. § 691.1407) (emphasis in original).  The officer's conduct is the proximate cause of an injury only when it is "the one most immediate, efficient, and direct cause preceding [the] injury."  *Robinson v. City of Detroit*, 613 N.W.2d 307, 317 (2000); *see also Jasinski v. Tyler*, 729 F.3d 531, 544 (6th Cir. 2013) (noting that the

"proximate-cause inquiry under [M.C.L. § 691.1407] is different from proximate-cause analysis in other contexts because of the use of the definite article 'the'").

McCann's and Beltz's conduct preceding the shooting of Rucinski was not the proximate cause of his injuries (and death). Rucinski's own conduct – wielding his knife, saying "here we go" or "bring it on," and approaching to within five feet of McCann – created the need for McCann and Beltz to use force against him. Under these circumstances, no reasonable factfinder could conclude that the manner in which McCann and Beltz entered the garage was the one most immediate, efficient, and direct cause preceding Rucinski's death.

That is precisely the conclusion that the Sixth Circuit reached in *Livermore, supra*. In that case, police officers surrounded the home of a suspect who was wanted for multiple offenses and who had barricaded himself inside of his house. After speaking with police negotiators, the suspect agreed to surrender unarmed. When he exited the house, however, the suspect carried a rifle and hid between two trees. Lieutenant Jerry Ellsworth ("Lt. Ellsworth") and another officer then approached the suspect in a light armored vehicle. A police sniper saw the suspect point his gun toward the officers in the vehicle. The sniper fired two shots, killing the suspect. *See Livermore*, 476 at 401. Thereafter, the suspect's estate brought a gross negligence claim against Lt. Ellsworth, claiming that he had "recklessly created the circumstances leading to [the suspect's] death." *Id.* at 406, 408. The Sixth Circuit held that Lt. Ellsworth was immune from the claim because his decision to approach the suspect in the light armored vehicle was not *the* proximate cause of the suspect's death:

23

> [W]e conclude that the proximate cause of [the] suspect's
> death was not Lt. Ellsworth's conduct, but rather [the
> suspect's] decision to disregard his promise to surrender
> unarmed…. Because Lt. Ellsworth's conduct was not the
> proximate cause of [the suspect's] death, he is immune from
> [the] claim of gross negligence….

*Id.* at 409.

As in *Livermore*, the proximate cause of Rucinski's fatal injury was his own conduct, not the conduct of the deputies who fired at him. McCann and Beltz are entitled to immunity because their actions were not *the* proximate cause of Rucinski's death.

## D. Municipal Liability

Finally, Plaintiff brings a municipal liability claim against Oakland County under 18 U.S.C. § 1983. (*See* Compl. at ¶¶34-38.) Plaintiff alleges that Oakland County failed to adequately train the officers, had inadequate policies and procedures, and used illegal customs or practices. (*See id.*)

It is well established that in order to prevail on a municipal liability claim under § 1983, a plaintiff must first establish that a municipal employee violated the Constitution. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). Indeed, "[t]he deprivation of a constitutional right is a prerequisite to municipal liability under § 1983." *Pollard*, 780 F.3d at 401. *See also Ewolski v. City of Brunswick*, 287 F.3d 492, 517 (6th Cir. 2002) ("Where, as here, a municipality's liability is alleged on the basis of the unconstitutional actions of its employees, it is necessary to show that the employees inflicted a constitutional harm."); *Doe v. Sullivan County, Tenn.*, 956 F.2d 545, 553 (6th

24

Cir. 1992) ("Absent a constitutional injury, there [are] no grounds upon which to impose liability upon the municipality.").

As explained above, Plaintiff is unable to establish a constitutional violation by an employee of Oakland County. Accordingly, Plaintiff's § 1983 municipal liability claim against Oakland County fails as a matter of law.

## CONCLUSION

The events surrounding Rucinski's death are undeniably tragic. Nonetheless, applying binding precedent to the undisputed facts here requires the conclusion that Defendants are entitled to judgment on all of Plaintiff's claims. Accordingly, for all of the reasons explained in this Opinion and Order, **IT IS HEREBY ORDERED** that the Defendants' Motion for Summary Judgment (ECF #25) is **GRANTED**. **IT IS FURTHER ORDERED** that Defendants' "Motion for Leave to File Expert Disclosures or, in the Alternative, to Strike Undisclosed Opinions of Dr. Werner Spitz" (ECF #31) is **TERMINATED AS MOOT**.[7]

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: June 23, 2015

---

[7] In her response to Defendants' Motion for Summary Judgment, Plaintiff cited the deposition of Dr. Werner Spitz for the proposition that Rucinski was falling forward when McCann shot him. (*See* ECF #28-11.) Defendants sought to strike Dr. Spitz's testimony on the grounds that he is an expert witness and that Plaintiff did not identify him in Plaintiff's Rule 26 disclosures. (*See* ECF #31.) The Court terminates this motion as moot because Dr. Spitz's testimony, even if admissible, would not create a material factual dispute sufficient for Plaintiff to withstand summary judgment.

25

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 23, 2015, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113